UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ANAEN GOYBURU CORP., VILLAGE TAXI CORP.,
P.C., TAXI CORP., and LUSO AMERICAN TAXI, INC.,

                              Plaintiffs,

      - against -

VILLAGE OF PORT CHESTER, VILLAGE OF PORT
CHESTER BOARD OF TRUSTEES, MAYOR DENNIS
PILLA, VILLAGE TRUSTEE DOMENICK CICATELLI,
VILLAGE TRUSTEE JOSEPH KENNER, VILLAGE
TRUSTEE ROBERT SORENSEN, VILLAGE TRUSTEE
GREGORY ADAMS, VILLAGE TRUSTEE DANIEL
BRAKEWOOD, VILLAGE CLERK OF PORT CHESTER,
AND DOLORES GONZALEZ,

                              Defendants.
------------------------------------------------------------------------x

09-CV-3540 (CS)

**MEMORANDUM DECISION
AND ORDER**

Appearances:

Thomas Decea
Yenisey Rodriguez-McCloskey
White Plains, New York
*Counsel for Plaintiff*

Brian S. Sokoloff
Mark A. Radi
Sokoloff Stern LLP
Westbury, New York
*Counsel for Port Chester Defendants*

Ralph F. Schoene
White Plains, New York
*Counsel for Defendant Gonzalez*

Seibel, J.

      Plaintiffs Anaen Goyburu Corp., Village Taxi Corp., P.C., Taxi Corp., and Luso

American Taxi, Inc. commenced this action on March 20, 2009 against the Village of Port

Chester and an array of Port Chester Village officials (collectively, the "Port Chester

1

Defendants"), and Dolores Gonzalez, who applied for and was granted a taxi dispatcher license by the Village of Port Chester in early 2009. (Doc. 1 Ex. A.) The action was removed by Defendants from New York State Supreme Court, County of Westchester, to this Court on April 7, 2009. (Doc. 1.) After a conference with the Court on June 4, 2009, Plaintiffs filed an Amended Complaint on August 7, 2009. (Doc. 19.) The Port Chester Defendants have moved to dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 12(c). (Doc. 21.) Defendant Gonzalez has moved to dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 12(b)(6). (Doc. 30.) For the reasons stated below, the Port Chester Defendants' motion is granted in part and denied in part, and Gonzalez's motion is granted.

## I.     **Background**

Plaintiffs in this case are four taxi dispatch companies operating in the Village of Port Chester. (Am. Compl. ¶ 1.) Prior to the events giving rise to this action, Plaintiffs enjoyed a veritable "quadropoly" on taxi dispatching services in the Village of Port Chester. This lawsuit arises from the issuance, on February 24, 2009, of a taxi dispatcher license to Defendant Gonzalez. Plaintiffs allege that the issuance of the license violated Section 295-20E of the Code of the Village of Port Chester (the "Code"), which provides, in pertinent part, that "[t]he number of companies which may be licensed under this section at any one time is four." (*Id.* ¶ 7.) Gonzalez's dispatcher license, which allegedly went into effect in March 2009, was the fifth such license issued by the Village of Port Chester. (*Id*. ¶¶ 16–17.)

Gonzalez had applied for a dispatch license for the 2008-2009 year. (*Id*. ¶ 9.) Having heard nothing by August 2008, she commenced a proceeding in state court under Article 78 of the New York Civil Procedure Law and Rules, requesting that the Village act on her application

and grant the license. (*Id*. ¶ 32; Affidavit of Dolores Gonzalez ("Gonzalez Aff.") Ex. C.)[1] In its answer, the Village (through Defendant Pilla) stated that Gonzalez's application had been denied in November 2008 pursuant to Section 295-20E. (Gonzalez Aff. Ex. D; Am. Compl. ¶ 9.)

Upon learning of the denial, Gonzalez appealed it to the Village Board of Trustees. (Am. Compl. ¶ 11.) Plaintiffs allege that Gonzalez's appeal was successful and that her application was authorized on February 24, 2009, during "an executive session closed door meeting by and among [Defendants]." (*Id*. ¶¶ 14–16.) They allege that they were not given notice that the Board would be considering Gonzalez's application on that date, and that when they learned of that fact, their representatives who attended the meeting were not permitted to be heard or to observe the Board's deliberations. (*Id*. ¶¶ 13–16.) They later learned that the Board had rescinded its earlier denial and issued Gonzalez a license. (*Id*. ¶ 16; *see* Gonzalez Aff. Ex. H (February 24, 2009 Board of Trustees resolution granting license).)

On March 13, 2009, the state court denied as moot Gonzalez's application under Article 78. (Affirmation of Brian Sokoloff ("Sokoloff Aff.") Ex. B.) The instant action was filed in state court on March 30, 2009. (Doc. 1 Ex. A.) On May 18, 2009, the Board of Trustees

---

[1] It is appropriate for this Court to refer to the documents filed in the state court because a Court may, on a motion to dismiss, consider documents relied upon in the Complaint or documents, such as court documents, of which the Court may take judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (document can properly be considered in adjudication of motion to dismiss when plaintiff relies "on the terms and effect of a document in drafting the complaint"); *In re Winimo Realty Corp.*, No. 09-9307, 1998 WL 872500, at *3 n.1 (S.D.N.Y. Dec. 15, 1998) (taking judicial notice of consent order between parties "which [was] a matter of public record, acknowledged by both sides, and bears directly on the issue"). Plaintiffs' Amended Complaint refers to and relies on Gonzalez's lawsuit against her co-defendants. (*See* Am. Compl. ¶ 32.) I consider the state-court documents not for the truth of the matters asserted therein, but only for the fact that the statements therein were made.

adopted a local law that, among other things, amended Section 295-20E(1) of the Code to permit the issuance of five taxi dispatch licenses rather than four. (Sokoloff Aff. Ex. C.)[2]

Plaintiffs' claim against the Port Chester Defendants, which the latter now move to dismiss pursuant to Rule 12(c), is brought pursuant to 42 U.S.C. § 1983, alleging that those Defendants, in deviating from Section 295-20E(1) of the Code, violated Plaintiffs' constitutional rights to due process of law—specifically, procedural due process.[3] Plaintiffs further allege that Gonzalez "used her political influence" to get Village officials to act on her behalf and to have her sister, Awilda Gonzalez, appointed to "the Strategic Taxi Review Advisory Committee in an apparent attempt to improperly affect the Advisory Committee's decision making process to [Defendant Gonzalez's] favor." (*Id.* ¶ 32.) Their claim against Gonzalez, which she now moves to dismiss pursuant to Rule 12(b)(6), is for "malicious interference with . . . [Plaintiffs'] contract rights." (*Id.* ¶¶ 34–35.)[4]

---

[2] I may take judicial notice of the state of the law. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes."); *Zimmelman v. Teachers' Retirement System of City of N.Y.*, No. 08-6958, 2010 WL 1172769, at *8 n.10 (S.D.N.Y. Mar. 8, 2010) ("A court may take judicial notice of relevant statutory materials on a motion to dismiss."). I consider the local law for the fact of its enactment, not for the truth of the "Background and legislative intent" section included in it.

[3] Plaintiffs have not responded to the Port Chester Defendants' argument that the conduct alleged here does not rise to level of a denial of substantive due process—an argument the Court finds persuasive—and focus in their opposition exclusively on procedural due process. Accordingly, to whatever extent Plaintiffs asserted a substantive due process claim—the petition alleges only that they were denied notice and an opportunity to be heard before Gonzalez's license was issued, and does not mention substantive due process—it is dismissed.

[4] Plaintiffs had also originally asserted a claim against the Port Chester Defendants under Article 78, seeking "a mandamus compelling the revocation of the illegal fifth taxi dispatcher's license to [ ] Gonzalez." (Am. Compl. ¶ 23.) The Article 78 claim was remanded for further adjudication in the New York State Supreme Court for the County of Westchester. (Doc. 29.)

## II.   Discussion

### A.   Standard of Review for a Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

5

misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).[5]

The Court applies to a motion for judgment on the pleadings under Rule 12(c) the same standards as are applied to a motion to dismiss under Rule 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

### B.  The Port Chester Defendants' Motion

The Port Chester Defendants move pursuant to Fed. R. Crim. P. 12(c), which permits a motion for judgment on the pleadings to be made "[a]fter the pleadings are closed." The Port Chester Defendants have answered, (Doc. 3), but Defendant Gonzalez has moved to dismiss instead of answering. Plaintiff therefore argues that the pleadings are not closed and the motion is thus "procedurally defective." (Pls.' Br. at 4.) Because the Port Chester Defendants are moving for judgment on the pleadings as to the Section 1983 due process claim, which does not name Gonzalez, I consider the pleadings closed as to that claim, and accordingly will consider the motion. Holding the Port Chester Defendants' motion in abeyance until either Gonzalez's claim is dismissed or she answers would unnecessarily delay the proceedings and would do nothing to advance the evaluation of the claim against the Port Chester Defendants. Moreover, I

---

[5] Plaintiffs, in their Memoranda of Law, state that the court should only grant a motion to dismiss if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . .'" (Petitioners' Memorandum of Law in Opposition to the Motion to Dismiss of the Municipal Respondents ("Pls.' Br.") at 4 (quoting *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992)); Plaintiffs' Memorandum of Law in Opposition to Defendant Gonzalez's Motion to Dismiss ("Pls.' Br. II.") at 5 (same).) But the case in which the "no set of facts" standard was articulated, *Conley v. Gibson*, 355 U.S. 41 (1957), was abrogated by the Supreme Court three years ago in *Twombly*, 550 U.S. at 563 (*Conley*'s no-set-of-facts standard "has earned its retirement"). The current standard of review is as set forth in *Twombly* and *Iqbal*, pertinent parts of which are quoted above. Not only was *Iqbal* decided months before Plaintiffs filed their briefs, but the *Twombly* standard had been controlling in this Circuit for more than two years. *See Iqbal v. Hasty*, 490 F.3d 143, 157-58 & n.7 (2d Cir. 2007), *rev'd on other grounds*, 129 S. Ct. 1937.

can discern no conceivable prejudice to the Plaintiffs from addressing the motion at this stage, and Plaintiffs do not allege any. *See Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26, 35–36 (D.D.C. 2004). I now turn to the merits of the motion.

"To state a claim under section 1983, a complaint must allege that the defendant deprived plaintiff of a right secured by the Constitution or laws of the United States and that such deprivation was committed by persons acting under color of state law." *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir. 1987) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Dwyer v. Regan*, 777 F.2d 825, 828 (2d Cir. 1985), *modified on other grounds*, 793 F.2d 457 (2d Cir. 1986)). A government actor may not deprive individuals "of interests encompassed by the Fourteenth Amendment's protection of liberty and property" without due process of law. *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). The plaintiff must establish both that it had a protected property interest, *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985), and that it was deprived of that interest by a state actor without due process, *see Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). The right to procedural due process "requires that when a State seeks to terminate [a constitutionally-protected] interest . . . it must afford notice and opportunity for hearing appropriate to the nature of the case *before* the termination becomes effective." *Bell v. Burson*, 402 U.S. 535, 542 (1971) (internal quotation marks and citations omitted) (emphasis in original).

Property interests do not arise from the Constitution itself, but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. Plaintiffs argue, and Defendants do not seriously dispute, that they have a property right in their licenses. *See*, *e.g.*, *Padberg v.*

7

*McGrath-McKenchie*, 203 F. Supp. 2d 261, 276 (E.D.N.Y. 2002). That hardly ends the matter, however, because there is no allegation that any action by the Port Chester Defendants deprived the Plaintiffs of their licenses. Rather, the allegation here is that Plaintiffs were deprived of their right to operate as one of only four, rather than five, licensees.

The Port Chester Defendants, in addressing whether Plaintiffs have a property right in the right to operate as one of only four licensees, treat the Complaint as alleging the May 18, 2009 amendment to the Village Code as the action that potentially deprived them of that right. They then argue that because one has no property right to be free from competition, *see*, *e.g.*, *Hegeman Farms Corp. v. Baldwin*, 293 U.S. 163, 170 (1934), and no property right to have the law remain the same in perpetuity, *see*, *e.g.*, *Daub v. N.Y. State Liquor Auth.*, 45 Misc. 2d 833, 839 (N.Y. Sup. Ct. 1965) (internal quotation marks omitted), the amendment of the Code to permit the fifth license did not violate any property right of Plaintiffs. The Complaint, however, does not allege the May 18, 2009 amendment as the act that deprived Plaintiffs of their property right. Rather, it alleges that the issuance of the fifth license by resolution on February 24, 2009, while the Code prohibited such action, was the act the worked the deprivation.[6]

Defendants are correct that Plaintiffs have no property right in the law remaining unamended, but Plaintiffs are correct that until Section 295-20E of the Code was amended, it was an "existing rule" that gave rise to a property right to operate as one of only four licensees. *Cf. Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) ("the right to exclude others [is] one of the most essential sticks in the bundle of rights that are commonly characterized as property") (internal quotation marks omitted). "[A] compensable [property] interest is indicated by the absence of express statutory language precluding the formation of a property right in

---

[6] Indeed, the original petition in this case was filed on March 20, 2009, before the amendment occurred.

8

combination with the presence of the right to transfer and the right to exclude." *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1331 (Fed. Cir. 2005). Here Section 295-20E does not contain statutory language precluding the formation of a property right or prohibiting transfer[7], and it does provide that the four licensees will have the exclusive right to operate. Where the government retains the discretion to determine the total number of licenses issued, licensees cannot exclude others from entering the market and diluting the value of their licenses, so the license does not support a property right. *Id*. at 1334. Here, in contrast, Section 295-20E restricts the discretion of the government and requires that no more than four licenses issue. It thus forms a property right to operate as one of only four licensees.

It is not the amendment of that Code that deprived Plaintiffs of a property right—Defendants are correct that a mere "unilateral expectation," *Roth*, 408 U.S. at 577, that the law would not be amended does not create a protectable property right—but the expectation that local officials will follow local law and not illegally grant a license that it is prohibited by statute from granting is not a mere unilateral expectation. Rather, Plaintiffs have a "legitimate claim of entitlement," *id.*, to government action that complies with existing law.

That the Port Chester Defendants allegedly acted before the Code permitted the issuance of the fifth license distinguishes this case from *Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, No. 07-1789, 2007 WL 4531332 (D. Minn. Dec. 19, 2007), *aff'd*, 572 F.3d 502 (8th Cir. 2009), on which Defendants rely. There the licensees challenged the amendment of a local ordinance lifting the cap on the number of taxi licenses that could be issued, thus reducing the value of such licenses on the secondary market. Because the license provided no guarantee

---

[7] Section 295-20E(2) apparently stated, at the time the fifth license was issued, that "[a]ny change in ownership must be completed in accordance with this chapter." (Gonzalez Aff. Ex. E at 30.) Whatever that might mean, it does not seem to preclude transfer of a license.

that the limit on the number of licenses would last indefinitely or that the licenses would have any particular value, and because the city was permitted to amend the ordinance as it saw fit, plaintiffs had no property right in the value of their licenses on the secondary market. 2007 WL 4531332, at *4; *see* 572 F.3d at 508–09 (property owner aware that regulation could change, and ordinance contemplated periodic review of number of licenses issued). Had Defendants here done what the City of Minneapolis did—raised the cap and then issued the additional license—the logic of that case would be controlling. But the Defendants here did not change the regulation until after the fact. What they allegedly did in this case was disregard the regulation, thus upsetting a legitimate expectation originating in state law. While "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), here the Code (until amended on May 18, 2009) deprived the Port Chester Defendants of the discretion to issue a fifth license. *See Minneapolis Taxi Owners*, 572 F.3d at 510 (municipal ordinance may create protected property interest by establishing procedural requirements that impose substantive limitations on exercise of official discretion). I thus conclude that Plaintiffs had—during the period February 24, 2009 to May 18, 2009—a property interest in operating as one of only four, not five, taxi dispatch licensees.

Defendants argue that even if Plaintiffs had such a right, a post-deprivation hearing under N.Y. C.P.L.R. Article 78 provided a sufficient post-deprivation remedy to satisfy the demands of due process.

> Generally, due process requires that a state afford persons some kind of hearing prior to depriving them of a liberty or property interest. However, due process does not require the impossible. Where a deprivation at the hands of a government actor is random and unauthorized, hence rendering it impossible for the

> government to provide a pre-deprivation hearing, due process
> requires only a post-deprivation hearing.

*DiBlasio v. Novello*, 344 F.3d 297, 302 (2d Cir. 2003) (internal quotation marks and citations omitted); *see Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996). Plaintiffs have not bothered to respond to Defendants' argument on this point and I am tempted to regard that silence as a concession. But I will not do so because the law is so clear that the "random and unauthorized" exception to the requirement of a pre-deprivation hearing "does not apply where the government actor in question is a high-ranking official with final authority over significant matters." *DiBlasio*, 344 F.3d at 302 (internal quotation marks omitted). Here the alleged actors (at least the mayor and trustees[8]) seem to be the highest-ranking decision-makers within the Village on the subject of the issuance of taxi dispatch licenses and apparently were in a position to provide pre-deprivation process had they so chosen. *See RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987) ("[T]he action of a high-ranking official body, such as the Town Board, which has 'final authority over the decision-making process' cannot be considered random and unauthorized.") (quoting *Dwyer*, 777 F.2d at 832–33). While discovery may reveal that one or more of them does not in fact fit that category, I cannot say at this stage that any Port Chester Defendant was a lower-level employee as to whom the exception for "random and unauthorized" acts might apply. *See generally Velez v. Levy*, 401 F.3d 75, 92–93 (2d Cir. 2005).

The Port Chester Defendants next argue that the individual members of the Board of Trustees are entitled to legislative immunity for the acts of which Plaintiffs complain. While local legislators are entitled to absolute immunity for legislative acts, *see*, *e.g.*, *Harhay v. Town*

---

[8] The Village Clerk is named as a defendant but the Complaint does not make clear whether his or her role was as an active participant in the decisionmaking or was purely ministerial.

11

*of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003), whether an act is in fact legislative is a "functional test . . .depend[ing] on the nature of the act itself," *id*.  While discovery may reveal that the decision to issue the fifth license on February 24, 2009, was legislative, it appears, at least at this stage, that the decision was administrative.  Unlike the May 19, 2009 amendment of the Code, which took the form of a local law, (*see* Sokoloff Aff. Ex. C), the February 24, 2009 issuance of the fifth license took the form of a resolution and arose in the context of Gonzalez's appeal from the initial denial of her taxi dispatch license, (*see* Gonzalez Aff. Ex. H).  I cannot say at this stage that the Port Chester Defendants' action on February 24, 2009, was legislative rather than administrative (or perhaps quasi-judicial) in nature.

The individual Port Chester Defendants further argue that they are entitled to qualified immunity.  The doctrine of qualified immunity "shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A government official sued in his individual capacity is entitled to qualified immunity:  (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was "objectively legally reasonable . . . in light of the legal rules that were clearly established at the time it was taken." *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal citations omitted); *see Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In light of my conclusion that Plaintiffs had a property interest in the right to operate as one of only four, not five, licensees, I cannot say that the conduct of the Port Chester defendants in diluting that right without notice or a hearing was not a violation of law. The extent to which that right was clearly established presents a closer question. I am aware of no clearly established law saying specifically that a statute limiting the number of licensees creates a property right in the licensees, but such a level of specificity is not required. *See Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2003) (for right to be clearly established, cases must have defined right with reasonable specificity or to have clearly foreshadowed the ruling; absence of decision directly addressing right at issue will not preclude finding that law was clearly established). It was clearly established in 2009 that sources such as state law—in this case, a local law clearly stating that only four licenses may be issued—give rise to property rights and that the government ordinarily cannot deprive one of a property right without notice and an opportunity to be heard. *See*, *e.g.*, *Roth*, 408 U.S. at 577. Further, I cannot say it was objectively legally reasonable to issue a fifth license when the applicable statute clearly limited the number of licenses to four—in other words, that it was reasonable to break the law administratively rather than amend it legislatively. The issue of qualified immunity may be revisited, however, after discovery, when the exact nature of the actions undertaken by each defendant may be more clear.

Accordingly, the Port Chester Defendants' motion for judgment on the pleadings is granted in part and denied in part. Plaintiffs' claim against them may go forward to the extent it alleges a deprivation of procedural due process arising from the February 24, 2009 issuance of the fifth license to Gonzalez at a time when the applicable regulation prohibited the issuance of more than four licenses.[9]

---

[9] It does not appear that Plaintiffs have any valid claim for damages arising from the period following the May 18, 2009 legislative amendment of Section 295-20E, both because the

**C.      Defendant Gonzalez's Motion**

Plaintiffs' sole claim against Defendant Gonzalez is for "malicious interference with [Plaintiffs'] contract rights." (Complaint ¶¶ 34–35.)  Although "this cause of action does not exist under New York law," *Balukrishnun v. Kusel*, No. 08-1440, 2009 WL 1291755, at *11 (E.D.N.Y. May 8, 2009), the Court can consider "two [other] potential causes of action that may encompass [Plaintiffs'] allegations: (1) tortious interference with contractual relations; and (2) tortious interference with prospective economic advantage." *Id*.  Plaintiffs were advised at the conference on June 4, 2009, to clarify which of these causes of action they were asserting against Gonzalez.  The Amended Complaint is no better tailored to a specific cause of action than the original Complaint was, but Plaintiffs' memorandum of law makes clear that they claim tortious interference with prospective economic advantage.[10]

---

Village remained free to amend its regulation at any time and Plaintiffs had no "legitimate claim of entitlement" that the law remain the same, and because that amendment appears to be plainly a legislative act to which immunity would attach.

[10]     If Plaintiffs intended to advance a claim of tortious interference with contract, that claim would fail for failure to allege either the existence of a valid contract between them and a third party, or a breach by that third party.  *See Trionic Assocs., Inc. v. Harris Coy*., 27 F. Supp. 2d 175, 185 (E.D.N.Y. 1998) (citing *Lama Holding Co. v. Smith Barney, Inc*., 88 N.Y.2d 413 (1996)).  None of the cases Plaintiffs cite hold or even suggest that a license issued by a local government creates a contract between the government-licensor and the private licensee.  (*See* Pls.' Br. II 7–9.)  While those cases might support the conclusion that licensees have a property right in their licenses, an enforceable property right and a contract are not the same thing.  Further, Plaintiffs have not "identif[ied] a specific contractual term that was breached," *Millan v. Ojima*, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005) (citing *Risley v. Rubin*, 272 A.D.2d 198, 199 (N.Y. App. Div. 2000)), as required under New York law, but rather have accused Gonzalez of inducing a breach of their "rights," (Am. Compl. ¶ 32), and of the Village's "obligations," (*id*. ¶ 34).  The source of those "rights" and "obligations," however, is found not in the license (even assuming it to be a contract), but in local law—specifically, Section 295-20E(1).  To the extent Plaintiffs have a right to operate as one of only four, not five, taxi dispatchers, and to the extent the Village is obliged to license only four, not five, such dispatchers, that right and that obligation do not stem from any contract.  In sum, the licenses are not contracts, and because the issuance of Gonzalez's license would not violate any term of Plaintiffs' licenses, a claim of tortious interference with contract would not lie in this case.

A claim for tortious interference with prospective economic advantage claim is "very difficult to sustain." *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995).

> Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."

*Kirch v. Liberty Media Corp.,* 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). The unfair or improper activity need not necessarily be unlawful, but must at least be "wrongful." *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003).

"Wrongful means," as defined under New York law, can include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract." *Id.* (internal quotation marks omitted). A lawsuit is wrongful if the actor has no belief in the merit of the litigation or, having some belief in its merit, nevertheless institutes the suit in bad faith, intending to harass third parties rather than bring his or her claims to a conclusive adjudication. *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986). As a general matter, "mere suspicions are inadequate to support a claim for tortious interference with business relations." *Scutti Enters.*, 322 F.3d at 217; *see Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382–83 (2d Cir. 2000) (allegations "based solely on . . . 'suspicions' . . . cannot suffice to support a claim for tortious interference".).

Plaintiffs have adequately pleaded that they had a business relationship with a third party, (Am. Compl. ¶ 31), and that Gonzalez was aware of that relationship, (*id*. ¶¶ 8–9). I will assume for the sake of argument that Plaintiffs' relationship with the Village was injured. But Plaintiffs must still have adequately pleaded that Gonzalez interfered with the relationship using dishonest, unfair, improper or otherwise wrongful means.[11] *See Kirch,* 449 F.3d at 400.

Plaintiffs point to two possible actions as the basis of "wrongful means' by Gonzalez. First, they allege that Gonzalez "us[ed] her political influence to coax Town officials to disregard the law [and] caus[e] her sister—Awilda Gonzalez—to be appointed to the Strategic Taxi Review Advisory Committee in an apparent attempt to improperly affect the Advisory Committee's decision making process to her favor." (Am. Compl. ¶ 32.) Second, they assert that Gonzalez "commenc[ed] an action against [the Village of Port Chester] . . . causing a fifth illegal taxi dispatcher's license to be issued by respondents which is a breach of the rights of the [Plaintiffs] under their respective taxi dispatcher Licenses." (*Id*.)

The allegations of alleged use of "political influence" are entirely conclusory. The Amended Complaint contains no facts from which it may be inferred what political influence

---

[11] Although Plaintiffs allege that Gonzalez's interference was malicious in nature, there are no allegations in the Amended Complaint to plausibly support a finding of malice here. "It is well-settled that where a party acts, at least in part, in accordance with its normal economic self-interest, it cannot be found to have acted solely out of malice for the purpose of a tortious interference claim." *Semple v. Eyeblaster, Inc*., No. 08-9004, 2009 WL 2709281, at *4 (S.D.N.Y. Aug. 27, 2009) (citing *Carvel Corp.*, 3 N.Y.3d at 190). As numerous courts have observed in other contexts, malice is rarely at play when a party is acting in its own economic self-interest. *See Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.,* No. 08-494, 2009 WL 891837, at *7 (W.D.N.Y. Feb. 5, 2009) ("A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm."); *cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"). Thus, any tortious interference with prospective economic advantage claim against Gonzalez must be premised upon her alleged use of "dishonest, unfair, . . . improper," or otherwise "wrongful" means.

Gonzalez supposedly had, how it was wielded to influence Village officials, how it was wielded to get Gonzalez's sister appointed to the Strategic Taxi Review Advisory Committee, why it would have been wrongful had she done so, what effect (if any) the sister's presence had on any action of the Committee, or what effect (if any) the Committee had on the decision to issue Gonzalez's license.[12]  Indeed, "political influence" could mean no more than participation in the political process or persuasion of others of the correctness of one's position.  But "[m]ore than simple persuasion is required" to establish a tortious interference claim.  *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002); *see Scutti Enters.*, 322 F.3d at 216.  In any event, the only fact Plaintiffs cite is that Gonzalez's sister was on a committee that seems, as far as one can tell from the Amended Complaint, to have had nothing to do with the issuance of Gonzalez's license.  The "political influence" allegations thus fall far short of plausibly alleging—let alone showing—dishonest, unfair or wrongful means.  *See Iqbal*, 129 S. Ct. at 1950.

With respect to Plaintiffs' allegation that Gonzalez commenced an action against the Village of Port Chester, Plaintiffs have failed to allege any facts to support their claim that that action constituted "wrongful means."  The Amended Complaint does not provide any information as to the nature of the proceeding or what role it may have played in interfering with

---

[12] The Amended Complaint alleges, in conclusory fashion, that "[t]he Advisory Committee was set up to give an opinion concerning the taxi dispatcher's licenses," and that Gonzalez's sister's presence "caused the opinion of the Committee to be skewed." (Am. Compl. ¶ 33.) But it sets forth no facts supporting the inference that the Committee made recommendations on particular applications (as opposed to general recommendations regarding taxi service in the Village) or made a recommendation on Gonzalez's application, and it does not explain what Gonzalez's sister's views were, whether they differed from the views of anyone else on the Board, or why it would be wrongful if others on the Board found her views persuasive. Not only is the Amended Complaint devoid of facts suggesting that Gonzalez's sister had any influence on Gonzalez's application for a dispatch license, but it is crystal clear that it was the Village Board of Trustees, not the Advisory Committee, that had the authority, in law and in fact, to issue or not issue such licenses.

17

Plaintiffs' relationship with the Village of Port Chester, stating no more than that Gonzalez "commenc[ed] an action." (Am. Compl. ¶ 32.) I will assume that Plaintiffs mean to refer to Gonzalez's Article 78 action seeking a favorable decision on her dispatch license application.

Although civil suits can, in some circumstances, constitute the wrongful means used to tortiously interfere with prospective economic advantage, *see Scutti Enters.*, 322 F.3d at 216, Plaintiffs' "[t]hreadbare recital[]" that Gonzalez commenced an action to interfere with Plaintiffs' relationship with the Village of Port Chester does not meet *Iqbal*'s requirement that Plaintiff plead facts that are more than "merely consistent with . . . defendant's liability." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted). Plaintiffs simply refer to the action in conclusory fashion, without explaining anything about it, let alone how it was "wrongful." Many lawsuits are entirely appropriate, and the mere existence of such a suit does not demonstrate dishonest, unfair, or wrongful means. For this reason, plaintiffs alleging that a lawsuit was wrongful must allege facts plausibly suggesting that the person bringing the suit believed it to be meritless or brought it solely to harass. *See Universal City Studios*, 797 F.2d at 75. No such allegations are present here.

In the absence of any facts to plausibly support the claim that Gonzalez used "wrongful means" to interfere with Plaintiffs' relationship with the Village of Port Chester, Plaintiffs' claim for "malicious interference" must be dismissed.

### C. Leave to Amend

Although Fed. R. Civ. P. 15(a)(2) counsels that courts "should freely give leave [to amend] when justice so requires," the Court has discretion to consider several factors, including the apparent futility of amendment, in determining whether to allow amendment. *See Grace v. Rosenstock*, 228 F.3d 40, 53–54 (2d Cir. 2000). The purpose of amending a pleading is to enable

a party to assert matters that were overlooked or unknown at the time of the original complaint. *Smiga v. Dean Witter Reynolds, Inc*., 766 F.2d 698, 703 (2d Cir. 1985).

The Court dismisses Plaintiffs' claims against Defendant Gonzalez, and against the Port Chester Defendants to the extent the Amended Complaint purports to allege either a substantive due process violation or a procedural due process violation arising from the legislative amendment of Section 295-20E of the Code on May 18, 2009, with prejudice, as it is evident that permitting Plaintiffs leave to amend again would be futile.  Plaintiffs amended the original complaint after a pre-motion conference on June 4, 2009, at which the Defendants stated the grounds on which they intended to move to dismiss, and after Gonzalez had filed her motion papers.  (*See* Docs. 12–17.)  Had Plaintiffs been able to advance facts addressing the deficiencies discussed above, they would have been included in the Amended Complaint.  Further, Plaintiffs have not suggested that there are any additional facts that they now wish to assert.  Accordingly, leave to amend is denied as futile.

## III.    Conclusion

For the reasons set forth above, the Port Chester Defendants' Motion for Judgment on the Pleadings is DENIED to the extent the Amended Complaint asserts a claim for deprivation of procedural due process arising from the issuance of a fifth taxi dispatcher license before such action was permitted under the Code, and is GRANTED in all other respects, and Defendant Gonzalez's Motion to Dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 21, 30), and to terminate Dolores Gonzalez as a

Defendant in this case. The remaining parties are to appear at a status conference on July 8, 2010, at 9:30 a.m.

**SO ORDERED.**

Dated: June 14, 2010
      White Plains, New York

                                          CATHY SEIBEL, U.S.D.J.